| 15 | 519 |
|---|---|
| 102 | 211 |
| 15 | 519 |
| 104 | 51 |
| 104 | 611 |
| 15 | 519 |
| 122 | 389 |
| 15 | 519 |
| 131 | 163 |
| 15 | 519 |
| 135 | 42 |
| 15 | 519 |
| 139 | 343 |
| 15 | 519 |
| 151 | 670 |
| 15 | 519 |
| 153 | 158 |
| 15 | 519 |
| 160 | 15 |
| 160 | 514 |
| 15 | 519 |
| 87a | 124 |
| 15 | 519 |
| 166 | 501 |

## RIDDICK vs. WALSH.

1. The Spanish law of community did not prevail in this State after the taking effect of the Territorial act of July 4th, 1807. The dower given to the surviving wife, by that act, was in lieu of her interest under the Spanish law.

2. A thing which is in the intention of the makers of a statute, is as much within the statute as if it were within the letter.

3. In construing a statute, if possible, effect must be given to all its provisions.

4. When there is no express contract, the law of matrimonial domicil will govern, as to all the rights of the parties, to their present property in that place, and as to personal property every where upon the principle, that movables have no *situs*, or rather, that they accompany the person everywhere: as to immovable property, the law *rei sitae* will prevail.

| 15 | 519 |
|---|---|
| 168 | 2 73 |

5. When there is no change of domicil, the same rule will apply to future acquisitions as to present property. But where there is a change of domicil, the law of the actual domicil, and not of the matrimonial domicil, will govern as to all future acquisitions of movable property; and as to all immovable property, the law *rei sitae*.

6. The law existing at the time of the marriage, and not that at the time of its dissolution by death, determins the marital rights of the parties.

7. A special execution issued on a judgment rendered in a suit against the husband alone, to foreclose an equity as redemption under a mortgage, executed by the husband and wife, and accompanied by the wife's acknowledgment and relinquishment of dower, bars the wife's dower claimed under the act of 1825.

8. There is a marked distinction throughout the books, between cases, where a suit affects a wife's interest in real estate, which is claimed in her own right, and those in which she has only an inchoate right of dower. In the former class of cases no instance is to be found, in which it is not maintained that a wife is a necessary party to the proceedings, in order to divest her right. In the latter class the husband alone is deemed the proper party, to defend a proceeding instituted to divest the title to land, to which a mere inchoate right of dower has attached.

Riddick vs. Walsh.

## APPEALL from St. Louis Circuit Court.

### STATEMENT OF THE CASE.

On the 12th of August, 1812, the plaintiff was married to Thomas F. Riddick, with whom she lived as his wife until the 14th of January, 1830, when he died. On the 8th of October, 1814, Felicite Marle, of the territory of Missouri, conveyed by a deed of bargain and sale to Thos. F. Riddick of the same place, a lot in St. Louis, particularly described in the petition, fronting one hundred and twenty French feet on the west side of Fourth street, and running back westward of that width, one hundred and fifty French feet. On the 12th of May, 1818, the plaintiff and her husband mortgaged the lot to Alexander Stuart, which mortgage was, on the 13th of the same month, duly acknowledged by the plaintiff and her husband. On the —— day of —— 1824, Stuart assigned the mortgage to Nancy D. McDowell, and on the 1st of October, 1825, Nancy D. McDowell obtained a judgment in the circuit court of St. Louis county, foreclosing the mortgage; but the plaintiff was not a party to the judgment and proceedings of foreclosure. On the 13th of January, 1827, the circuit court ordered the sale of the mortgaged premises, to pay the sum for which the judgment of foreclosure was obtained; and on the 30th of April, 1827, the sheriff of St. Louis county, under a special writ of *fieri facias*, issued on the judgment of foreclosure, sold and conveyed the mortgaged premises to Ann D. McDowell. On the 30th of May, 1829, Thomas F. Riddick and the plaintiff executed a deed of conveyance of what purports to be the lot, to Alexander Stuart, but the certificate of acknowledgment does not state that the contents were made known to the plaintiff, and it is contended by the plaintiff that this deed is only intended to convey a lot on the west of the one in controversy, and does not include it, but the defendant insists that it does include it. On the 27th of April, 1850, the plaintiff in order to correct all mistakes and clear up all doubts, conveyed to the defendant all of her interest in that part of the mortgaged premises that is on Fifth street, which does not include the lot in controversy. On the 8th of January, 1850, the plaintiff filed her petition in the circuit court of St. Louis county, stating that she is entitled to one undivided half of the lot in fee simple, and to dower in the other half, by virtue of the Spanish laws, and the statute laws in force at the time of the purchase of the lot in 1814, and in her petition she asks, that such dower and other interest in the lot as the law allows to her, be assigned and set off to her, according to law, and she also asks for such other and further relief in the premises as she may be lawfully entitled to.

The defendant in his answer denies that the plaintiff became entitled to an undivided half of the lot in fee simple, as claimed by the plaintiff; and avers that he acquired all of the right, title and interest of the plaintiff and her husband by virtue of the foreclosure of the mortgage, and the sale of the mortgaged premises by the sheriff; that he holds the lot by intermediate conveyances from Alexander Stuart, who acquired the same as before stated. The defendant insists in his answer that the conveyance before mentioned, from Thomas F. Riddick and the plaintiff, to Alexander Stuart in 1829, is sufficiently executed and acknowledged, to convey the interest from the plaintiff and her husband to Stuart; that at the time of the death of Thomas F. Riddick, a large amount of just debts which have not since been paid, were due and owing by him to divers persons; and the defendant denies that the plaintiff is entitled to dower in the premises. A witness on the part of the plaintiff states, that he knows the premises in controversy, that the brick house on the lot is worth about $300 per annum rent; that the ground without the improvements is worth from $4 to $6 per annum per front foot on a lease for 10 years.

The defendant read in evidence a transcript from the record and proceedings of the county court of Jefferson county, in order to show that there are debts allowed against the estate of Thomas F. Riddick, which are yet unpaid, and the plaintiff objected to the reading of the transcript which was read, subject to the objection, to which the plaintiff excepted.

A witness offered by the plaintiff in rebuttal states, that letters *de bonis non* have been taken out on the estate of Thomas F. Rideick; that there is a tract of land in Jefferson county of several

Riddick vs. Walsh.

hundred acres, claimed by the representatives of Riddick; also another of two by forty apens, in the Prairie des Noyes, near St. Louis; that these lands are of sufficient value to pay the debts of the intestate. On being cross-examined, he stated, that in speaking of debts, he means those already proven up against the Riddick estate; and he does not know what other debts there may be, if any, and he only knows from hear-say, that letters *de bonis non* have been granted on Riddick's estate; that the interest of Riddick's representatives in the land referred to, will, of course, depend upon their title, and does not know of his own knowledge what that title is; that the lands themselves are of sufficient value to pay all the debts he knows of.

The plaintiff then asked for the following instructions:

1. If the court sitting as a jury, find that the plaintiff and Thomas F. Riddick were married on the 12th day of August, 1812, and that such marriage continued until the 14th of January, 1830, when said Riddick died, and that on the 8th day of October, 1814, the premises in question were conveyed by deed of bargain and sale to said Thomas F. Riddick, the plaintiff became by virtue of such deed, vested with one half of the beneficial interest in said premises and the introduction of the common law did not divest any right thus acquired, and unless the plaintiff is barred by the proceedings on the foreclosure given in evidence, she is entitled to redeem one half of the premises in controversy and paying one-half of any balance that may be due after the rents and profits shall be applied to the discharge of the debt, and that a decree or order for an account should be made upon the principles stated.

2. If the plaintiff is not entitled to the relief asked for in the first instruction, she is entitled to dower, subject to the mortgage, and that she is entitled to dower in the equity of redemption, and if any part of the mortgage money after applying the rents and profits remain due and unpaid in case the morgagee declines to receive his debt, she must keep down one-third of the interest of such balance, and if payment of the principal is required, the plaintiff must constitute her proportion, which will be settled and determined after the taking of such account.

3. The proceedings to foreclose the mortgage in question, do not bar the plaintiff and give no other or greater right to the purchaser at the sale, under the foreclosure, than would have been acquired by the husband's conveyance of the same premises.

4. If the court, sitting as a jury, find that the plaintiff and Thomas F. Riddick were married on the 12th day of August, 1812, and that such marriage continued until the 14th day of January, 1830, when said Thomas F. died, and that on the 8th day of October, 1814, the premises in question were conveyed by deed of bargain and sale to said Thomas F., the plaintiff became, by virtue of such deed, vested with one half of the beneficial interest in said premises, and the introduction of the common law did not divest any right thus acquired.

5. If the plaintiff is entitled to one half of the beneficial interest in said lot, she is also entitled to dower in the other half thereof.

6. If the plaintiff is not entitled to one half of the beneficial interest in said lot, she is entitled to dower in the whole of the same.

The court refused to give the 1st, 4th, 5th and 6th instructions, but gave the second and third, and decided the law to be as cited in the said last two instructions; and the plaintiff excepted to the opinion of the court, in refusing to give said 1st, 4th, 5th and 6th instructions.

The defendant asked for the following instructions:

1. The defendant moves the court to decide, as a matter of law, that the plaintiff is not entitled to recover any part of the lot described, as derived of Felicite Marle, upon the ground, that a community existed between the plaintiff and her deceased husband, Thomas F. Riddick.

2. The defendant further moves the court, to decide, as a matter of law, that the plaintiff is not entitled to dower in the lot described, as derived from Felicite Marle.

The court gave the first instruction asked for by the defendant, and refused to give the second, and the defendant excepted to the opinion of the court, in refusing to give the second instruction asked for by him.

On the 8th of May, 1851, the court below decided that the plaintiff was entitled to dower in the premises, but that she is not entitled to any part of the lot, on the ground that a community existed between the plaintiff and her deceased husband, and that she is not entitled to

any interest in the lot, except of dower above specified, but that the dower is subject to the mortgage, and the proceedings were referred to a commissioner in the usual way, to ascertain whether the mortgage had been satisfied or not. The commissioner reported that the mortgage was satisfied, which report was confirmed by the court. After the confirmation of the report, the court below rendered judgment that the plaintiff be seized and endowed during her natural life, of one third in value of the lot and improvements thereon, and three commissioners were appointed by the court to assign and admeasure the dower to the plaintiff and report to the next term. Each party made motions for a new trial, which were overruled and excepted to, and both parties appealed to this court.

SPALDING, for plaintiff.

The first instruction for the plaintiff calls on the court to say to the jury, that if Thos. F. Riddick married plaintiff on the 12th of August, 1812, and he died on the 14th of June, 1830; that on the 8th of October, 1814, the premises in question were conveyed by deed of bargain and sale to Thomas F. Riddick, the plaintiff, who became entitled to one half of the same, and the common law coming in afterwards did not divest it, &c.

In support of the principles laid down in this instruction, I observe that the statutes of the territory, in force when the marriage took place, that is, in 1812, having a bearing on the relation of husband and wife, as to property, are the following:

1. Territorial laws 125, passed July 1st, 1807, an act on wills descents and distributions. At page 128 the part of the act regulating descents and widow's rights commences: Sec. 6, sec. 15 page 131 provide, that the share of the intestate allotted to the widow, shall be in lieu and satisfaction of her dower at common law; and the next section (16th) enacts, that when a woman dies, leaving a husband, her lands and real estate shall descend &c., saving to the husband his right as tenant by the curtesy: Ibid. page 187, passed June 18th, 1808, section 1st, authorises the widow to remain in the mansion house of the deceased husband, and occupy the plantation thereto belonging, till her dower is assigned.

Act of Congress March 26th, 1804, (see page 6 terr. laws 1st Vol,) The 13 section of this act provides that the "laws in force in the said District of Louisiana at the commencement of this act" shall continue in force till altered, modified or repealed by the government and judges of the Indiana Territory.

Act of Congress approved March 3d, 1805 (sec. territorial laws p. 8 sec. 9,) a similar provision that the "laws and regulations in force in the said district at the commencement of this act, shall continue in force until altered, modified or repealed by the legislature."

Now what were the laws in force on the transfer of the country to the United States, on the subject of husband and wife, as regards the property acquired during the marriage, when there was no marriage contract?

It was this, that all property acquired during the marriage, except from donation and descent, belonged to husband and wife jointly. No matter to whom it was conveyed, or of what kind it was, on the death of either of the spouses, it belonged, the one half to the survivor and the other half to the heirs of the deceased: and this law was enacted into a statute by the acts of Congress before cited; or rather, it had the force of a statute.

When two persons entered into the marriage state under that law, the property afterwards acquired belonged to both : 1 White's compilation 56, 57; 10 Mis. Rep. 312, Picotte et al. vs. Cooly et al. This law was an enactment of the legislative authority of Spain: Nov. Recopilation Lib. 10. Title 4 Laws 1, 2, 3 &c;

Nov. Recop. Lib. 10 Title 4 law 1, 2, 3 &c.

It is supposed that the acts first above cited in 1807, passed by the legislature of the Territory of Louisiana, repealed this relation of husband and wife, or the law of community as it is commonly called. The objections to this doctrine are as follows:

Riddick vs. Walsh.

1. The acts do not purport in their titles, nor do they, in fact, in their provisions, profess to regulate or alter or amend the regulations respecting the relation of husband and wife, as to their rights in property acquired during marriage. They speak of the disposition of property, when a person dies, not when he or she gets married; and provide for the descent of the property left at the time of death; but that these provisions do not repeal, and were not intended to repeal the law of community, appears.

2. Because the act of 1807, as to the probate of wills, descents, distributions &c., applies to all estates of persons who should die after it went into force. Now all the married persons, living in the territory at the time of its passage, were in community with each other; that is, husband and wife were equally interested in the property acquired during the marriage, and the legislature could not alter that relation. If any of them should die, that law applied to the settling up the estate and superadded to the widow's share, that is, the undivided half of what was left, after the payment of debts, a life estate in one third of the land and slaves. Can this act be construed otherwise, as to the estates of the people of that community? The legislature must be held to know what the law was, and what would be the operation of that act, and if they intended to increase, thus much the interest of the widow in the property of the husband when she was a married woman at the date of the act, why did they not intend it, as to all future marriages? See act of Congress March 3d 1805, section 3 in 1 territorial laws p. 7.

3. The act of 1807 speaks of the provision therein made for widows, being in lieu of dower at common law; and as to the husband, if he survives, it speaks of his being tenant by the curtesy. Now there was no such thing here then, as dower, or curtesy. The act therefore provides, that her claim under it, shall be in lieu of what she had no right to and could not claim.

But what was dower, at common law? It was the claim of the widow upon the lands of the husband; not such interest as she had, in her own right, in the property. By the Spanish laws she was a partner with her husband and the property acquired during marriage belonged, as much to her as to him. It belonged to her in her own right. So did the husband's half belong to him in his own right. They were joint partners in the concern, equal in all things, except that the management devolved on him as being the most fit person to attend to it; but the wife was a full in-door partner, and equally interested in the partnership effects.

4. How can it be held, that so great an alternation in the relation of husband and wife, as the repeal of the partnership, which the Spanish law undoubtedly applied to the marriage state; should be, by inference so remote, and I may say so forced and unnatural? If they wished to repeal it, why did they not enact, that hereafter the marriage state shall not be attended by a partnership in the property acquired during the marriage? But we are to infer its repeal from a provision after the death of the husband, that the surviving widow shall have a life estate in one third of his real estate of inheritance and slaves after the payment of debts; and this shall be in lieu of her dower at common law, when she had no dower, and nothing like it. As well might the interest of the husband be called "dower" as that of the wife, for it resembled it as much. We are apt to have confused notions on this subject from being familiar with the details of a different system. Suppose partnerships in business were customary, in which, women were concerned jointly with men; and that the legislature should pass an act providing that on winding up such a partnership, where the female was the surviving partner, she should be entitled to an additional interest over and above her equal share, would this be considered as a prohibition of such partnership? It might form a reason why the male would not enter into it, but by no rule of construction could it be held to abolish such partnerships, or to regulate other of their incidents.

5. 9 Law Lib. Dwarris on Statutes, 638, it is laid down that an affirmative statute does not repeal a precedent affirmative one, and at page 712 it is said, "affirmative words do not take away the common law, a former custom or a former statute;" and at page 711 it is said, "a casus o missus can in no case be supplied by a court of law; for that would be to make laws. Judges

Riddick vs. Walsh.

are bound to take the act of parliament as the Legislature have made it." Apply these rules to the case, and there seems little difficulty.

The only question is, is there such repugnance between the act of 1807 and the law of community, that the latter is repealed. But there is no repugnance; the two can stand together. We may think against the policy of the particular provisions of the act of 1807, but with that we have nothing to do. Our mission is to expound the law as we find it, and not to make the law. The same author at page 756 says, "where the meaning of a statute is doubtful, the consequences, it is said, may be considered in its construction; but where the meaning is plain, no consequences are to be regarded in the interpretation; for this would be assuming a legislative authority."

Now the meaning of the act of 1807 is plain. It regulates descents, probate of wills, &c., in plain language. It provides for the widow in plain language; that is, it gives her one-third for life, of the real estate and slaves of which her husband died seized and possessed. This was to be in lieu of her dower at common law. But the common law was not in force here, nor was there any such thing as dower at common law here. That statute was undoubtedly taken from the statute book of some one of the States, perhaps Pennsylvania, and was introduced with all its phraseology fitted for another and different system, into this newly acquired territory, when the laws of Spain were in force; by construing the words "in lieu of dower at common law" to mean, in lieu of such interest in the property as the wife acquires during marriage, probably as great violence would be done to the meaning and instruction of the legislature as to hold that these words have no meaning or effect. For, judging of these instructions by their words and enactments, they designed to deprive her of her claim to one-third for life, of the real estate of which her husband had been seized of an estate in fee during coverture, and were given her in lieu of this one-third for life in such lands, and also one-third for life in the slaves, and one-third absolutely in personal property after payment of debs; or in case her husband died without leaving issue, one-half if lands, and slaves for life, and one-half of the personalty, absolutely. This would have been placing the widow in a more eligible situation than she occupied at common law, and such was the intent of the legislature. But construe this to repeal the law of community and you make that legislature design and intend by that act to curtail the interest of widows in the property acquired during marriage, and to place them in a condition far inferior to that in which they were placed by the laws then or previously in force. The legislature must have intended to benefit widows by the provisions made for them in that act, but if the act is construed as some persons think it should be it will not benefit them, but greatly injure them. As to women living in the marriage state at the date of the act it could work no injury, as the laws of the territorial legislature could not divest estates.

6. The words "in lieu of dower at common law," mean in lieu of dower at common law of England, as certainly as if it was expressed. It cannot mean the common law of Spain or the provinces, for, on this subject there was none, even if there were any common law or any thing in the nature of common law on other subjects. The community or conjugal partnership was created and regulated by enactments of the monarchs of Spain: Nov. Recop. See Lib. 10 Title 4 laws 1, 2, 3, 4 and 6, &c. These references are to the statutes of Spain, promulgated by the monarch, the legislative power in that State; and they create this equal community or co-partnership in the property acquired during marriage, between husband and wife. Taking the circumstances of the territory in which the governor and three judges were the legislative authority their recent appointment from the States when the common law was in force, their want of familiarity with the laws of the territory, written in a foreign idiom, and we can have no doubt that when they used those words, they had reference to dower at common law as it was in England and the States in the Union, which had all borrowed their laws from England. The most obvious and reasonable way of accounting for the mistake is, that they took the act from the statute book of some of the States without pruning it into conformity with the new laws and system into which they had been introduced as legislators. That they did know that the common law was not in force here is certain; for they must be presumed to have had so much intelligence as to have been historically acquainted with that fact. And they must have read the act of Congress approved March 3d, 1805, which conferred upon them these powers; and besides, 1

territorial laws, p. 124, sec. 68, they had introduced the common law, as to evidence in courts which were created by that act; thus showing that they knew that the common law was not in force here on that subject.

7. The words of the act of 1807, "seized or possessed" by the husband, do not mean all the property literally, of which he died "possessed," because he might have in possession property of another; and even he might be invested with the title of it; yet the heirs and the wife would not succeed to the ownership of it, nor was such the intention of the act. But the intention of the act was that "all such property as the husband owned in his own right," and that remained after the payment of his debts, should descend to his children, and one-third go to the widow for life.

8. The common law was introduced in 1816. This introduction was in doubtful words, and has been construed differently, but in latter times by this court, it has been held that it repealed and superceded the body of the Spanish law, and of course the relation between husband and wife, as to property acquired during marriage: 12 Mo. Rep. 257, Sandes et al. vs. Perkins, and in several cases, the decision in the case of Lindell and McNair, 4 Mo. Rep. 380, as to the deed of husband and wife, operating to convey the wife's property has been spoken of as establishing a rule of property acted upon for some time, and that therefore it would be overruled; but the decisions in latter times are based upon principles that would overrule it, so far as it is based on a recognition of the Spanish law being then in force.

## CASSELBERRY, for plaintiff.

1. The territorial laws of July 4th, 1807, gives the widow in the distribution of her deceased husband's estate "one-third of such lands and tenements of which the husband was seized or possessed during coverture, either by virtue of a deed, patent, entry warrant or surety," (see territorial laws, vol. 1, page 128, sec. 6.) This is the only law defining dower, or any other interest of the wife in real estate, that was possessed by the legislature, until the adoption of the common law in 1816.

2. It has once been directly, and several times indirectly decided by this court, that under the Spanish law, property, both real and personal, acquired or purchased during marriage, enters into the community, and at the death of the husband, one-half goes to the wife: (See Picot et al. vs. Cooly et al., 10 Mo. Rep. 312.) This point being settled the question as to whether the wife is entitled to a community interest or not depends on the construction of the territorial laws of 1807, to which we have alluded.

3. "The term sezin is a technical term, to denote the completion of that investiture by which the tenant was admitted into the tenure, and without which no free-hold could be constituted." Taylor vs. Horde, 1 Burr. 107, by Lord Mansfield. The word "seized or possessed," as used in the territorial law are synonymous in meaning, and include the property which the husband owned himself, in his own right, and has no reference to that which belonged to other persons, notwithstanding he might be in possession of it.

4. The 6th section of the law only intended to give the wife dower in the half belonging to the husband, and did not interfere with her half, except so far as the giving of curtesy to the husband in the 16th section, that is to say, the 6th section gives the wife an estate for life in one third of the husband's half, and the 16th section of the same law gives the husband a life estate in the wife's half. As an evidence that the legislature did not intend to interfere with the community of the wife the whole law except the 16th section relates to the administration of the husband's estate and to the manner in which his property shall be distributed after the payment of the debts. The 16th section provides that the estate of the wife after the payment of her debts shall descend in the same manner as the estate of her husband, reserving to him a life estate in it which is called curtesy.

5. The foreclosure of the mortgage from Thomas F. Riddick and wife to Alexander Stuart in 1824, is not binding on the wife, because she was not made a party to the proceedings.

34

6. As she was not made a party to the proceeding the purchaser at the sheriff's sale acquired no more title than he would have acquired if she had never signed the mortgage: See Revised Statutes of 1825, page 595, sec. 7, concerning "mortgages."

7. The deed of 1829 intended to convey the lot west of the one in controversy, but even if the intention was to convey the one in controversy, yet the deed is insufficient, because the certificate of acknowledgment does not say that the contents of the conveyance were made known to her.

8. If the dower is subject to the payment of the debts, yet it can be assigned before the debts are paid, and enjoyed by the widow until the property is sold by the administrator to make assets to pay the debts, or, in other words the right to dower was a complete vested right, at the time of the death of the husband, and could only be divested by a sale of the property to pay debts. If neither the creditors nor the administrator think proper to have the property sold, the widow can enjoy it, and no other person can prevent her. The debts of the husband are in the nature of an incumbrance, like a lien of a judgment. The judgment debtor can use and occupy real estate on which the lien of the judgment attaches, until the property is sold to satisfy the judgment, and the same rule applies to the right to dower in this case; but one of the witnesses testifies that there is property enough to pay the debts.

9. The act of January 21st, 1815, (Territorial laws, vol. 1 page 397, sec. 4) exempts the widow's dower from the payment of the debts of her husband. This act exponded her estate, and vested in her a right to dower subject to one condition only, that is, the death of the husband. The legislature, certainly, did not intend to contract her right by submitting it again to sale for debts; nor has the legislature power to do so, because it would be divesting a vested right. The legislature would have no more power to submit this dower to sale than a dower acquired under the present laws of this State which are now exempt from sale.

10. If the court should be of the opinion that the plaintiff is not entitled to a community interest, then we ask that the judgment of the court below be affirmed.


HAIGHT, for plaintiff,

1. At the date of the marriage in 1812, the Spanish law prevailed in the territory of Missouri, and by that, upon marriage, the relation of community was established between the parties. By the Spanish law, a community of goods between married persons existed without being stipulated for: Bruneau vs. Bruneau's heirs, 9 Martin R. 217.

2. All property possessed during marriage is supposed to be common except that which each shall prove to be his or her own separate property. All property acquired during marriage, by purchase or other onerous cause or title, belongs to the community: White's Com. vol. — p. 61.

3. The several statutes, in relation to dower, are not inconsistent with the rights of married women, under the law of community. They give dower in the husband's estate. That estate is what remains the property of the husband after the community is settled: Church vs. Bull and wife, 2 Denis 430. There is no inconsistency between dower and community, as the same person may have both. The interest vested when the property was purchased in 1814, and no change of laws could divest it. When the common law was introduced in 1816, it could have no effect upon the previously acquired right, but would regulate the mode of disposition or conveyance.

4 The right of redemption attaches to and is inseparable from any interest in the land mortgaged. The general principle, that whoever has any interest in land by way of lien or otherwise, present, future or contingent may redeem, cannot be denied. The right of redemption will attach whenever the interest becomes fixed or vested.

To this right, the foreclosure against the husband and joint security, was no bar; but of his, more hereafter.

11. If we cannot have community, we are entitled to hold our judgment for dower. The only

Riddick vs. Walsh

question upon this part of the case important to consider is, the effect of the foreclosure. If this barred her, then her claim is gone. That a wife may be endowed of an equity of redemption, has long been settled law in the United States. It is an unavoidable conclusion, that if the wife has dower in an equity of redemption, she is entitled to redeem. Any person having any right or interest under the mortgagor, may redeem: Kent's Com. vol. 4 p. 44; Gibson vs. Crehose, 5 Pickering 146; Swaine vs. Perine, 5 John. Chn. Rep. 482; Moniter vs. Wright, 16 Pick. R. 151; Bell vs. Mayor of N. Y., 10 Paige 49.

These authorities, which, for convenience, I have cited, together will be found, on examination, to settle the following principles:

1. A wife has dower in an equity of redemption in the United States. She cannot be deprived of this right by any act of the husband, such as a release, &c.

2. She is entitled to redeem, if she has joined in the mortgage, and cannot be barred more than any other person, except by a judgment after due notice and in the same manner as other parties are barred.

3. The statute of Missouri, under which this foreclosure was made, required all persons who executed the mortgage to be made parties to bar their or either of their interests in the land: Territorial Laws vol. 1 page — : The whife executes the mortgage, to bar her dower. That is, because she has, with her husband, an interests in the land. The statute requires the wife to be a party, if she joins in the mortgage as imperatively as the husband. Her interest may not be as great, but the amount or value of the interest is no test of the necessity of making her a party. This is according to an elementary rule that no person is bound by a judgment who is not a party thereto. Statute foreclosures may dispense with parties, to some extent, but where there is an interest, no presumptions can be indulged in favor of such dispensation: See, as before, Bell vs. Mayor of New York, and Gibson vs. Crehose.

The effect of any foreclosure under a statute, must depend upon the statute... These are as various, as the different States of the Union. No one, however, has yet come under my observation, that dispenses with a notice of some kind to the parties to the mortgage. A judgment, therefore, to which the wife was not a party and of which she had not notice cannot be a bar to her right to redeem.

Dependant says plaintiff is barred by debts of Riddick outstanding: Laws of 1825 page 332, sec. 1. No dower until debts paid. This is a provision for the benefit of creditors. No other person can object. Is it a good defence to a wrong doer, in possession of land claimed as dower? Outstanding title.

As to certificate of acknowledgment, see 1 Binney 470; 4 S. & R. 273; 14 ib. 84; 15 ib 71; 5 ib. 289; 6 ib. 49, 143; 9 ib. 273.

## B. B. DAYTON, for defendant,

I. Insists, that the court below committed no error in giving or refusing instructions asked in respect to the plaintiff's claim on the ground of community, because:

1. The statute of descents and distributions of July 4th, 1807, the statutes of July 7th, 1807, and of June 18th, 1808, concerning dower, all in force at the date of the marriage and of the acquisition of the lot in question, were repugnant to and inconsistent with the Spanish law of community and its continuation here, and had abrogated the latter, certainly in respect to all marriages occurring after these acts went into force.

2. If the law of community did exist, still the plaintiff has no interest by virtue thereof in said lot, because the mortgage to Stewart, of May 12th, 1818, and the foreclosure, sale and conveyance thereunder, passed all such interest to McDowell; but even if they did not, then the deed to Stuart of May 30th, 1829, effectually conveyed to him all interest which the plaintiff may have then had in said lot, on the ground of community.

I will first consider the effect of the statutes referred to upon the law of community. The marriage took place in 1812, and the lot was conveyed to the husband in 1814.

Riddick vs. Walsh.

The first and only statute of descents and distributions passed prior to that time was that of July, 1807, which went into force Sept. 1st, 1807: Territorial Laws vol. 1 — 125 and Sequor.

Sect. 6 of that act defines the rights of the widow when the husband leaves lawful issue in respect to real estate of which her husband died seized or possessed, not required to pay his debts and not sold or disposed of by will nor otherwise limited by marriage settlement, also, in respect to lands and tenements, of which her husband was seized and possessed during the coverture, either by virtue of a deed, patent, entry, warrant or survey, and to which she had not relinquished her claim to dower. The widow is to receive one-third for life, of all such lands and tenements.

Sec. 7 gives her one half of such lands and tenements or the rents and profits of one half during her natural life, in cases where the husband leaves no lawful issue.

The entire residue of the estate is disposed of by section 6 to 14 inclusive.

This statute was evidently intended to determine and regulate the rights of the widow and others, in regard to such lands as the husband was seized and possessed of, during coverture, by virtue of a deed, patent, entry, warrant or survey, and remaining undisposed of at his death, so far as the power existed, so to determine and regulate. Whether it affected or could affect lands acquired previous to the act or the rights of a wife under a marriage which took place previous to the act, is unimportant to the question in this case; for the marriage in this case, took place and the lot was conveyed to the husband after that act, No question arises here, in regard to the rights of a wife vested by marriage or to the power of the legislative authority to interfere with them. All the construction we claim for it in this case is, that the lands thereafter conveyed to a husband by deed, during a marriage thereafter occurring, and remaining undisposed of at his death, should descend, according to said act, and surely this construction must be given to it. It certainly could not have been intended, that in such case the wife should have community rights in the land and also the interest given by the statute. If it had been so intended, it would have been so laid.

But the terms used, embrace and are effectual as to at least all lands of the descriptions named, which the legislative authority had power to direct the descent of. And can it be doubted, that they had the power to direct such a descent as we claim would have taken place in regard to the lot in question, had it remained undisposed of at Riddick's death.

This view of the interpretation to be given to the statue of 1807 derives support from the decision of this court in Stokes vs. O'Fallon, 2 Mo. Rep. 32.

The court, in that case, had under consideration the statute of descents and distributions of 1822, which says, that henceforth, when any person, having title to real estate, shall die intestate, his estate shall descend and be distributed after the payment of debts in a certain manner "deducting the widow's right of dower, if there be one." The court says, "this saving in the act does no more than save the widow's dower from descending to the heir, which it otherwise would have done."

According to the view of the court, the act of 1822 would have abolished dower in all cases, certainly, where the marriage occured subsequently, had it not been for the saving clause in that act. Yet, according to the argument on the other side, dower might have continued to exist without the saving clause, for, say the counsel, the descent spoken of, is the descent of the husband's interest only, which interest is only what shall be left after carving out dower, community and every other estate which, by the general law of the land others may have in the property he possessed when he died or was during coverture passed of.

If the act of 1822 would have abolished dower, except for the saving clause; for the same reason it would have abolished community, so that, as to future marriages, it would not have existed, unless there is something in the character of the estate which calls for a distinction.

The act of 1807 disposes of the entire estate, without any saving in respect to community; and now let us enquire, whether there be any thing in the nature of the wife's community interest under the Spanish law, in respect to property conveyed to the husband during marriage, which should entitle it to exemption from the same effect which such a statute would have upon dower in regard to property subsequently acquired by the husband.

### Riddick vs. Walsh.

Both interests are incidents of marriage and neither can, as a matter of right, be controlled or disposed of by the wife during the continuance of the marriage in respect to one and of the community in respect to the other. The husband is the head of the community and has power to sell property acquired after the marriage, and the same is also subject to his debts. The interest of the wife in such property is therefore contingent, subject to be defeated by a conveyance made without her consent, or by being seized to pay her husband's debts without her consent. Like dower, she never comes to its enjoyment, control or disposition during the existence of the marriage, until the husband dies or the community be dissolved by a dissolution of the marriage relations or otherwise: she has no more enjoyment of a control over community than she has in regard to dower. Indeed, her power in respect to the disposition by her husband is less, in regard to community, than to dower, for her husband can sell the former without her consent, while the latter he generally cannot. There are other points of difference between the two interests, but they refer to a period after the death of the husband or the dissolution of the community.

I have been speaking entirely of the community right of the wife, in property conveyed to her husband during the existence of the community, called ganancial property, and have indicated some of its points of resemblance to dower. Property thus acquired, is not to be regarded as his. In the case of Sprigg vs. Bofier and wife, 5 Martin's Rep. (new series) page 54, the supreme court of Louisiana, in reference to property thus acquired say, "it is true, the benefits of a purchase made by the husband may be shared by the wife, but it is not true that she becomes the owner of the property, for he may sell it, exchange it or even give it away without her consent."

In support of what is above said, in regard to community, I refer to the following authorities: 3 Febrero page 164 No. 26; Ib. 173 Nos. 45, 46, 47, 48 and the note at page 164; Vol. 3 Recopilation page 426; Sib. 10 Title 4 Law 5; 6 La. Rep, 459, Fourne vs. His creditors; 10 La. Rep. 146; 5 Marlin U. S. 54; 1 White's Recop. 61; ganancial property.

I contend, therefore, that there is nothing in the character of the community interest in question, which would save it from abrogation by a statute of descents and distributions that would abolish dower, or save it from being affected, in all respects, as dower would be by such statute, there being no provision expressly saving or affecting either. If one would be abrogated, the other would be also. If, as I said in Stokes vs. O'Fallon, dower would descend to the heir, so also would the community interest, or, to use an expression, perhaps more accurate, the estate, in both instances, would descend, free from either interest.

On the 7th of July, 1807, an act was passed, recognizing dower and providing a mode by which it could be released, which act ;went into force September 1st, 1807: territorial laws Vol. 1 page 178.

On the 18th of June 1808, another act was passed concerning dower, and extending somewhat the rights of the widow, in relation thereto, and providing a mode in which she might obtain her rights: same Vol. page 187.

All the above mentioned statutes continued in force up to the marriage of the plaintiff and the acquisition by her husband of the lot in question.

But, if community existed here in 1812 or 14, I contend it exists here now. If it ever was abrogated or repealed, either before or since, by what has it been accomplished? Certainly, if prior to 1825, by our statutes of descents and distributions and concerning dower, the statutes of 1807-8, above referred to, were just as effectual, for such purpose, as any statutes of descents and distribution and concerning dower that have been enacted since.

If it be said, that the act of January 19th, 1816, introducing portions of the common law, repealed it, I answer, that no common law was introduced by that act which was contrary to the laws then in force here: Lindell vs. McNair, 4 Mo. Rep. 380.

If the law of community then existed here, it was uneffected by that statute, whether any common law of England was or was not contrary to it. If contrary, it was not introduced, if not contrary, of course it changed nothing.

How does the act of February 12th, 1825 (Rev. Code of 1825 vol. 2 page 491) declaring the

common law in force, affect community. The phraseology of that act differs from the act of 1816, but still the act introduced no part of the common law repugnant to or inconsistent with the statute laws in force for the time being. In the act of 1816, the term laws is used unqualified by the word statute, and therein consists the main difference between the two acts, so far as the question under consideration is concerned.

If the common law was in force, repugnant to or inconsistent with the Spanish law of community, the act of 1825 unquestionably repeals the latter, unless it was statute law. If statute law it was not repealed.

I think I may safely say, that the whole body of the Spanish law is statute law. It is composed entirely of enactments by the power authorized to make them, and it is unimportant whether that power existed with an emperior, a king or a legislature, or any two combined. It was all written law and written by the power that made it. But whether I am correct or not, in stating that the whole body of the Spanish law is statute law, certainly the law of community is such. All laws, the original institution and authority of which are set down in writing are statute laws. See Blackstone's definition in vol. 1 at pages 64 and 85; 1 White's Rewpracion 60 note 43.

The act of 1825, in regard to the common law, is the same as that of 1835 and 1845.

What would be the consequence of holding that the law of community prevailed, even up to 1825? Nobody supposed it did, and property was bought and sold upon the idea that it did not. An immense amount of property is and has been for years held and improved in good faith under titles good, if community did not prevail, but bad if it did. In estimating this amount, it must be remembered that the rights of the wife, in relation to community, are created by the marriage; so that if community then existed, it must continue in respect to all property acquired during the whole period of the marriage. The property then, affected by the marriages occuring prior to 1825, would be almost beyond calculation.

Indeed, to hold that the law of community prevailed up to 1816, would destroy a vast number of titles bought and sold, in good faith, and under a belief by all parties that they were good. Since 1807, indeed, property here has been dealt with upon the supposition that community did not exist.

But I think it must be held, that community has existed up to the present time, if it has existed at all since the act of July 4th, 1807, went into force, in respect to marriages occurring subsequently, and that by holding the latter, we must be prepared to take the consequences of the former.

If it has been abolished at all, it has been by means of statutes of descent and distributions and concerning dower, none of which are more effectual for such a purpose than those passed prior to 1812.

I come now to consider the second point, which is, that if the law of community did prevail here in 1812 and '14, still the plaintiff has no interest by virtue therof in the lot in question.

If it existed at all, it did so with all its incidents, and among these is the right before spoken of the husband to sell community property. The lot in question was conveyed to Riddick in 1814, and on the 12th of May, 1818, he mortgaged it to Stuart.

The plaintiff joined in the mortgage deed, though that was unnecessary to give it full effect, as the husband had full power, as the head of the community. to dispose of the lot. But her joining in it shows that it was for an object proper and fair towards her. The mortgage was, as against Riddick, certainly regularly foreclosed, and the property sold and conveyed there-under.

Now I maintain, that beyond all doubt, the mortgage, foreclosure, sale and conveyance aforesaid, were, at least, equivalent to a sale and conveyance direct by Riddick himself; and such a sale and conveyance by him would, of course, pass the title free from all community claims of the wife. See authorities as to community above cited; also act of 1825, concerning mortgages; Rev. Code of 1825, page 593, particularly sec. 7.

But we have still another conveyance, that of May 30th, 1829, to Stuart, which was effec-

Riddick vs. Walsh.

tual to convey any remaining interest that Riddick had, or that the plaintiff, by reason of community, had in said lot.

It is claimed, that in consequence of an alleged defective acknowledgment of this deed by the plaintiff, it did not pass her dower. That may be, and still it conveys her community rights. If Riddick alone had executed the deed, it would have conveyed her community interest. It matters not how defective the acknowledgment by her was, or whether she executed the deed at all.

It will be remembered, that the consideration of this deed was the release of the balance remaining unpaid of the debt secured by the mortgage already mentioned, which mortgage the plaintiff duly executed, and thereby recognized the justness of said debt, so that no pretence of any unfairness towards her can exist, if indeed it be a matter of any consequence whether there was any or not.

But it is claimed that the statutes of 1821 and 1825, relative to the mode of conveying property, affect the right and the mode of conveying community property, so far as to require the wife to join in and acknowledge, in a particular way, the deed conveying her interest. I deny this proposition in toto. The legislature has no power, after a marriage has been entered into, which created a community and property acquired under it, to change the rights of the husband in respect to such property, and say that he shall not sell it without the wife's joining in the conveyance and acknowledging it in a particular mode.

The husband's rights and power, as to the community property, cannot be taken away or changed after the property is acquired, if indeed they can be at any time after the marriage.

To say that he cannot sell such property without first getting the consent of his wife, and having it manifested in a particular mode, would be a direct interference with his vested rights.

But our statute, up to the date of the conveyance in question, May 30th, 1829, do not attempt to prescribe that the wife shall join in a conveyance of community property.

The act of June 22nd, 1821, Terr. Laws, vol. 1, page 756, relates exclusively to the real estate of the wife; that is, to her separate estate, not that which appertains to the community.

And, besides, that act merely says, that it shall be lawful to convey the property it refers to, in a mode pointed out, without excluding other modes. It purports to be, "an act to enable husband and wife to convey real estate belonging to the wife," but was unnecessary, as this court decided in Lindell vs. McNair; 4 Mo. Rep. 380. Nobody could have dreamed that a statute was necessary to enable the husband and wife to convey community property. The statute could not have been intended to affect such property.

This act was repealed in 1825. Rev. Code of 1825, under head of "Laws," page 500, sec. 13. The code of 1825, however, has substantially the same provision, page 220, sec. 12. But neither that nor any other in the code attempts to prescribe, that the wife shall consent to or join in a conveyance of community property. No other statute existed prior to the date of the deed, that can possibly be construed as bearing upon the question at bar.

II. The court erred in giving the instructions asked by the plaintiff, and refusing that asked by the defendant in respect to the plaintiff's claim for dower. I maintain that she was not entitled to dower for three reasons:

1. Because there is existing unpaid, a large amount of just debts, which were due and owing by the said Thomas F. Riddick at the time of his death.

2. Because her dower was barred by means of the mortgage to Stuart of May 12th, 1818, the foreclosure thereof and the sale under the execution issued upon the judgment.

3. Because her dower was barred by the deed to Stuart of May 30th, 1829.

In support of the first reason, I refer to the act of 1825 concerning dower, page 332, sec. 1, Rev. Code of 1825, in force at the death of Riddick. By the very terms of this act, a widow shall not "be entitled to dower in any lands, tenements or hereditaments, until all just debts due, or to be due by her deceased husband, shall have been paid."

Riddick vs. Walsh.

The evidence in this case shows that of the debts duly proved up against Riddick's estate, about $2000, with interest thereon for about twenty years, remains unpaid. The plaintiff was administratrix, and no funds ever came to her hands to pay any part of such balance. There was an attempt made to show that there is now property that belonged to Riddick sufficient to pay the debts; but there was an utter failure to show it, as will be seen by reference to the testimony of Brooks, the only witness who testified about it. He only knew that lands were now claimed by the heirs of Riddick of sufficient value to pay debts. What their title is, or whether of any value he did not know. But I conceive it makes no difference whether there is property or not, so long as the debts remain unpaid.

It is claimed, however, that the plaintiff is entitled to the possession of her dower until the creditors avail themselves of their rights to have it applied to pay their demands.

I answer to this, that such is not the language of the statutes. That is explicit, that she shall not be entitled to dower in any lands, &c., until all such debts shall be paid; until then she has no right of dower.

Why, in any view of this statute, should she, in preference to the possessor under foreclosure from her husband, be entitled to the benefit arising from the non action of creditors. Such possession is liable to account to creditors whenever they chose to require it. The claim of creditors in such case, is of similar nature to an outstanding title, which a defendant in ejectment may set up without any regard to whether it ever will or will not be asserted against him. He can set it up, even though it is at the very time barred as to him by the statute of limitations. Walsh can only be required to yield up one-third of this lot to a person who has a better right to it than either Walsh himself or any body else has. The plaintiff has no right till creditors are paid. Not only the law but the equities are against her claim. The lot in question had been twice appropriated to pay her husband's debts before he died. Only a few months prior to his death, a debt was extinguished in part by such appropriation, which debt, had it not been extinguished, would have taken precedence of any claim of the widow to any real estate of her husband.

The words "grant, bargain and sell" are in the deed of May 12th, 1829, unrestrained and unlimited. Supposing the plaintiff should succeed in getting dower in this lot, the plaintiff would have a claim upon the estate of Riddick, under the covenants in the deed, which would come within the expression in the act of 1825 of debts due or to be due: See Kennerly vs. Missouri Insurance Company, as to what law is to govern in this case. I suppose the act of 1825. But the act of 1807, in force at the date of the marriage, gave the widow no dower in real estate until after the payment of debts.

In support of the second reason, I refer again to the express language of the same section of the act of 1825. No widow shall be entitled to dower in any lands, &c., which had been sold, in good faith, under execution against her husband in his life time. This lot had been so sold under an execution—a special one it is true, but still an execution, and so designated in the act of 1825, respecting mortgages, pages 594–5, secs. 5 & 6.

It is claimed, however, that none but general executions are intended to be embraced. But such is not the language of the act and it would be difficult to find any reason for a distribution. Each commends the application of the property of the defendant to pay a debt of the defendant. Why should not a sale under an execution, directing specific property to be sold to pay a debt, be as effectual, in passing the widow's dower, as a sale of the same property under a general execution. Looking at the reasonableness of the thing, it would seem, that the sale in question ought to be more effectual to such end, than would have been a sale under a general execution; because the wife had joined in the mortgage, that pledged the lot for the payment of the debt.

But the first section of the act of 1825, declares that the provisons of that act shall not be so construed as to effect the rights of any creditor or other person in any contract entered into prior to the passge of that act.

And in Kennerly vs. Missouri Insurance Company, 11 Mo. Rep, 205, it is held, in reference

tȯ dower, that when the rights of purchasers or others, having a specific lien on property are concerned, their rights must be determined by the law which regulated the subject when the rights originated. If we are to look to the act in force at the date of the mortgage, to determine the rights of the parties under the mortgage, we shall find, that all lands sold on execution and all lands which have been mortgaged and sold in pursuance of a decree of a court of justice, are exempted from widow's dower: Act of 1815, Territorial laws vol. 1st, 399 sec. 2; the act of 1817, same vol. 509, did not repeal this provision: Kennerly vs. Missouri Insurance Company, 11 Mo. 205.

The only act concerning mortgages, passed prior to 1825; was that of October 20th, 1807, which was in force up to 1825; Territorial laws vol. 1st, 182.

By that act, the sale made under a foreclosure, was not by means of what was then called an execution; hence, the act of 1815, in terms, exempted from dower lands sold on execution, and lands that have been mortgaged and sold in pursuance of a decree of a court of justice.

The act of 1825, concerning dower, omitted the latter clause, because, a sale in pursuance of the mortgage act of 1825, was to be upon was called an execution, so that the term execution, in the dower act of 1825, covered all that was embraced by the entire terms referred to in the act of 1815. The act of 1815, in speaking of lands which have been mortgaged and sold, in pursuance of the decree of a court of justice, did not mean only such mortgages as the wife should join in, nor such decree only as should be rendered in suits to which she was a party. For such needed no legislation to bar dower.

But did the statutes, in force at the date of the mortgage, give the widow dower in an equity of redemption? If not, her dower in the lot is effectually barred by the mortgage: Stell vs. Carroll; 12 Peters 201.

But independent of the consideration above mentioned, the mortgage was regularly foreclosed, so as to bar the widow's dower It was not necessary. I contend that she should have been a party to the proceedings to foreclose. A suit must have been against the mortgagor or his heirs and executors and administrators, and the tenants or occupiers of the mortgaged premises: Act of 1825, concerning mortgages, 593, sec. 1.

It is true, that she had joined in the mortgage for the purpose of relinquishing her dower, but was she a mortgagor, within the meaning of the act, so as to be required to be joined in a suit with her husband in order to foreclose her rights. The proceeding was but one mode of collecting a debt due by the husband. A general judgment against him; in a suit to which she was no party, and a sale thereunder, of the same property, would have passed her dower. Why necessary to make her a party to the proceedings to foreclosure in order to accomplish the same end. I conceive that the language of the statute did not demand it, and the general poilicy of our laws at that time, did not require it. See section of same act, respecting the sale and the effect of a deed.

In support of the 3d and last reason, I remark, that the only ground upon which it is claimed, that the deed of May 30th, 1829, does not bar the plaintiff's dower in that the certificate of acknowledgment by her is defective, in omitting to state that the officer, Judge Carr, who took the acknowledgment, acquainted her with the contents of the deed. The act of 1825, concerning conveyances, Rev. Code of 1825, section 11 page 219, governs this case.

The certificate does state, she was personally known, &c., and was examined, separate and apart from her husband; and upon such examination, she acknowledged and declared, that she executed said deed and relinquished her dower, &c, voluntarily, freely and without compulsion or undue influence of her said husband.

This is sufficient, as has been repeatedly decided upon statutes almost precisely like our own.

A substantial compliance with the law is all that is required: Alexander & Betts vs. Merry, 9 Mo. 514, and cases there referred to by counsel and court.

The supreme court of Indiana, in Stevens vs. Doe, 6 Blackford 475, held a certificate with the same omission and others, sufficient under a statute quite as strong as our own. The court say it will be presumed the contrary not appearing, that the officer did his duty as to

Riddick vs. Walsh.

the separate examination of the wife and the making her acquainted with the contents of the conveyance.

The statute, which is set out in the opinion, requires all that ours does in regard to the certificate.

The supreme court of Ohio, in Chesnul vs. Shane, 16 Ohio, 599, held, under a similar statute referred to in the opinion, that the deed of a married woman is valid, and passes dower when there exists no other objection than the omission in the certificate of acknowledgment of the statement, that the officer made known to her the contents of the deed. The case in 6 Blackford, is quoted with approbation.

The same court, in a later case, Sprague vs. Converse, decided at the September term. 1851, Western Law Journal, 42, held, under another but similar statute, a similar certificate sufficient. The statute under which this decision is made, is in the statute of Ohio, vol. 29 page 347.

The supreme court of Pennsylvania, in McIntyre vs. Ward, 5 Binney 296, held a certificate good which omitted to state what the state statute required to be done, to-wit: that the officer "should read to the wife or otherwise make known to her the full contents of the deed."

The supreme court of Kentucky, in Nantz vs. Barley, 3 Dana, 111, thoroughly considered this whole subject and held a certificate like that now before this court sufficient.

Such contracts are to be construed liberally to uphold titles acquired in good faith and long held: See cases above cited.

In the case at bar, the plaintiff had suffered nearly twenty years to elapse after she became a widow before she asserted any claim.

Scott, J., delivered the opinion of the court.

The first question which presents itself for our consideration is, whether, after the taking effect of the territorial act of July 4th, 1807, which gave dower to the widow in her deceased husband's estate, the widow of a deceased person, who was married subsequently to the period that the said act took effect, and prior to the introduction of the common law of England, was entitled to the provision made for her by the Spanish law of community, in addition to her dower; or, in other words, whether the Spanish law of community prevailed in this State, after the taking effect of the act of July 4th, 1807, in favor of women who were married subsequent to that event. The question is stated with this precision, in order to relieve us from answering a portion of the argument which is founded on a state of circumstances which do not exist in the cause now under consideration.

By the Spanish law of community, the husband and wife became partners in all the estate, real and personal, which they respectively possessed. All that was acquired or purchased during coverture, whether real or personal estate, went into partnership, as being presumed to have been the fruits of the joint industry and economy of the husband and wife. On the dissolution of the partnership, by death, the surviving party and the representatives of the deceased, each took

back what was brought on his or her side into the partnership in value or kind; in value of personal estate, in kind, of real estate; and what remained, being considered as gain or profits, was equally divided as between partners. The husband, being the most suitable person, managed the concerns of the partnership, and might, without the consent of the wife, dispose of any of the partnership effects, purchased during the marriage.

It is conceded that all the Spanish laws which prevailed here prior to the cession of Louisiana, continued in force until they were superseded by competent authority.

The act of 1807 gave the widow, as dower, in the event of there being lawful issue, one-third of the lands and slaves during her life, and one-third of the personal estate absolutely, after the payment of the debts of the deceased. Comparing this provision, for the widow, with the subsequent laws in relation to dower, we can see no great difference between it and the dower that has been allowed since the undoubted repeal of the law concerning community. The fact that the first provision made by law for widows, does not materially vary from that now allowed them, furnishes an argument that, in the judgment of the legislature, the dower given under the act of 1807 was a sufficient allowance for them ; consequently there can be no ground for supposing that their rights, under the law of community, were intended to be preserved. A thing which is in the intention of the makers of a statute, is as much within the statute as if it were within the letter. 7 Bac. The act of 1807 made provision for the administration and distribution of the entire estate of a deceased person. It is impossible to conceive that if, in the intention of the legislature the law of community existed, but that some mention of, some reference to it must have been made. Looking at the rights of the wife under the law of community, as above stated, could a statute for the administration of estates have been framed without some reference to it? If we reflect on the closeness of the connection between the two subjects, such an omission would have been almost a matter of impossibility. It may be put to the profession, whether, if the law of community was in force at this day, it would be possible to avoid its mention in framing the statutes concerning administrations, descents and distributions, and last wills and testaments? These statutes, with modifications, were in force from 1807 until 1816, and yet during all that time, no reference was ever made in any of them to the law of community as being in force.

The 15th section of the act of 1807 declares, that the share therein allotted to the widow, shall be in lieu and satisfaction of her dower at

common law. From the proviso to the 7th section of the act concerning dower and alimony, it would seem that the Spanish law, in relation to rights growing out of the marriage state, was in the mind of the legislature. It is said that there was no such thing as dower here at the date of the act of 1807, and consequently that the clause above cited, provides that the widow's claim under it shall be in lieu of what she had no right to, and could not demand. We are so much in the habit of considering the common law of England as the only common law existing, that when these terms are used, we are at a loss to conceive how they can be applied to any other system of law. The idea of the common law is familiar to the minds of all legislators informed in our system of jurisprudence. It imports a system of unwritten law, not evidenced by statutes, but by tradition and the opinions and judgments of the sages of the law. Is it singular, then, that American legislators, coming into a country where they found existing a provision for married women, which was a substitute for dower as known to them, whose existence depended, so far as they knew, on unwritten law, custom and usage, should term that substitute, "dower at common law?" Although the thing is misdescribed in terms, yet that which was intended is clearly signified. In construing a statute, we must, if possible, give effect to all its provisions. To say that the terms "dower at common law," meant dower as it was understood by the English common law, would render the 15th section of the act of 1807 entirely inoperative. It is said that the law of community was evidenced by a written law promulgated by the king of Spain, to whom, under the Spanish system of government, exclusively belonged the power of legislation. This may be so; yet it is an historical fact, that the books containing those laws had never been seen at that day in this State. To the people here it was an unwritten law, known only by usage and custom as the common law was known, and under such circumstances it was not at all remarkable that it should be called "the common law." We are informed that the first printed book brought into this State, containing any Spanish law, was the Partidas, and that event occurred later than the year 1820. But there were weighty reasons operating on the minds of the legislature, why the Spanish law of community should be abolished, and dower, as known in the American states, substituted in its place. The French and Spanish inhabitants in the State, at that day, to whom the law of community was only known, were not numerous. No increase of their numbers was anticipated from emigration, while there were many Americans from the United States, to whom dower at common law was known and approved; and if not then, it was

foreseen that in a few years they would be much the larger portion of the inhabitants, and would continue to increase until there would be an unmeasurable disproportion between them and the ancient inhabitants of the province. It was wise in the legislature, then, to frame its laws in conformity to the notions of a large portion of the inhabitants then residing here, and who, it was foreseen, would in a few years overspread the entire State. It is a circumstance not without its influence, in the determination of this question, that no case can be found in our books of reports in which this claim is asserted, much less maintained, although the period of forty-four years have elapsed since it might have been done. The case of McNair vs. Biddle, 8 Mo. Rep. is not an exception, as Mrs. McNair was unmarried prior to the passage of the act of 1807. We are of opinion, then, that the dower given to the surviving wife, by the law of 1807, was in lieu of her interest under the Spanish law, in what is called the community.

The next question arising is, whether Mrs. Riddick was entitled to dower at her husband's death in 1830? and if entitled, under what law that was in force at the date of the marriage, or that was prevailing at the time of the death of her husband? Judge Story, in his conflict of laws, says, that the two following propositions have much of domestic authority for their support, and none in opposition to them : 1st. Where there is no express contract, the law of the matrimonial domicil will govern as to all the rights of the parties to their present property in that place, and as to personal property every where, upon the principle that movables have no *situs*, or rather, that they accompany the person every where. As to immovable property, the law *rei sitae* will prevails: 2nd. When there is no change of domicil, the same rule will apply to future acquisitions, as to present property. But where there is a change of domicil, the law of the actual domicil, and not of the matrimonial domicil, will govern as to all future acquisitions of movable property; and as to all immovable property, the law *rei sitae*. It would seem to follow, as a consequence from these principles, that the law existing at the time of the marriage, and not that at the time of its dissolution by death, would determine the material rights of the parties. Whatever might be the inclination of our minds in relation to this question, if it was now presented to us as a new one, yet the contrary opinion has so long prevailed, as well in regard to foreign as to domestic marriages, and has been so universally acted upon, that its overthrow would introduce great confusion in estates that have been already administered. If ever the maxim *communis error facit jus* was worthy of application, it would be on this occasion. The common opinion, in this instance, is

not merely speculative and theoretical, but has been made the ground work and substratum of practice. Every estate within our knowledge has been administered upon the supposition that the law existing at the time of the dissolution of the contract by death, regulates the right of the widow to dower, as well in cases where the marriage was celebrated in other states as in this State.

The next question that presents itself is, whether the special execution, issued on the judgment rendered in the suit, to forclose the equity of redemption under the mortage, barred the dower of Mrs. Riddick. Mrs. R. was no party to the proceedings to foreclose the equity of redemption, although she executed the deed and relinquished her dower to the lands thereby conveyed. The act of 1825, under which the dower claimed in this suit must be assessed, provided that no widow should be entitled to dower in any lands which had been sold, in good faith, under execution against her husband in his lifetime. There is no difference affecting this question, between a sale under a general judgment and one under the statute concerning mortgages. A sale under a general judgment, conveys all the right, title and interest, the debtor had in the lands sold on the day of the rendition of the judgment; a sale on a special fieri facias, disposes of such right only as could have been conveyed at the date of the mortgage deed, had it been an absolute one. On the one hand, it was argued that as the land out of which this right of dower is claimed, had been sold under a special fieri facies on the judgment in the mortgage proceedings, that was a sale under execution, within the meaning of the act, and therefore the right of dower was barred. On the other hand, it was contended that the wife was a necessary party to the proceedings to foreclose the equity of redemption, and not being joined, she could not be affected by a judgment in a suit to which she was no party. There is a marked distinction throughout the books between cases where a suit affects a wife's interest in real estate, which is claimed in her own right, and those in which she has only an inchoate right of dower. In the former class of cases, no instance is to be found in which it is not maintained, that a wife is a necessary party to the proceedings, in order to divest her right. In the latter class, the husband alone is deemed the proper party to defend a proceeding instituted to divest the title to land to which a mere inchoate right of dower has attached. Whoever heard of a wife's being joined as a party defendant to an action of ejectment, brought to recover land possessed and claimed by the husband in his own right? In the case now under consideration, if the husband had given no mortgage, and if suit had been brought for the debt secured by it, in the common way,

Riddick vs. Walsh.

the land might have been sold by execution, and the right of dower thereby extinguished. Can it make a difference, that a mode of procedure more favorable to the husband than an ordinary suit at law, was adopted? In the mode prescribed, the wife has given her assent to the deed, and there must have been at least nine months intervening between the commencement of the suit and the sale of the mortgage premises. The fact that the mortgage property could only have been sold on the special execution, makes no difference; for if the execution had been a general one, the husband could have elected that the land mortgaged should have been first sold to satisfy the debt; and the property, saved from execution by the sale of the mortgaged premises, would have remained, from which dower would have been taken.

The execution of the mortgage, with the wife's acknowledgment and relinquishment of dower, the proceedings to foreclose the equity of redemption, the judgment, execution and sale by the sheriff, together with his deed, are the links in the chain of title of the purchaser at the sheriff's sale. The wife having given her assent to the deed, and having a mere inchoate right to dower in her husband's estate, who was still in existence, and he being competent to defend such interests of the wife in all other proceedings against him, no reason is perceived why the wife should have been made a party to this suit. So, in either point of view, the wife is barred of her dower. If, before the foreclosure, the wife's right to dower had become consummate by the death of her husband, the attitude of this case would be entirely different.

The case of Dent vs. Narmy, 8 Barbour's Rep. 618, has been examined, and it seems to stand so much upon the provisions of the N. York Code, as to furnish little analogy for the determination of the cause now under consideration. The case of Bell vs. The Mayor of New York, 10 Paige's Rep. seems rather to furnish views in support of the conclusion to which we have arrived.

Judge Ryland concurring, the judgment will be reversed and the cause remanded.

Judge Gamble did not sit in the cause.